# UNITED STATES DISTRICT COURT

# DISTRICT OF IDAHO

RICHARD DRENNON,

    Plaintiff,

vs.

RANDY BLADES, S. BROOD, JULIE
BRYANT, DISTRICT FOUR PROBATION,
ANGEL DOBREV, IDAHO BOARD OF
CORRECTIONS, IDAHO COMMISSION
OF PARDONS AND PAROLE, M. MASON,
and JANE VORHES,

    Defendants.

Case No. 1:19-cv-00021-REB

**MEMORANDUM DECISION
AND ORDER**

      Pending before the Court is a Motion for Summary Judgment filed by Defendants

Randy Blades, Steve Brood, Julie Bryant, District Four Probation, Angel Dobrev,

Montelito Mason, Idaho Board of Corrections, Idaho Commission of Pardons and Parole,

and Janae Vorhes. Plaintiff Richard Drennon, a prisoner in the custody of the Idaho

Department of Correction (IDOC), has filed an "Objection" and "Declaration." (Dkt. 22.)

Defendants have filed a Reply (Dkt. 25), and Plaintiff has filed a "Supplement" and a

Sur-reply (Dkts. 26, 27.) The Motion is now fully briefed and ripe for adjudication.

      All named parties have consented to the jurisdiction of a United States Magistrate

Judge to enter final orders in this case. (Dkt. 15.) *See* 28 U.S.C. § 636(c) and Fed. R. Civ.

P. 73. Accordingly, having considered the submissions of the parties and finding oral argument unnecessary, the Court enters the following Order.

## BACKGROUND

On July 22, 2016, Plaintiff Richard Drennon and three other plaintiffs filed a civil rights action against a multitude of defendants under Case No. 1:16-cv-00329-REB. The Idaho state defendants filed an Answer. (Dkt. 8.) The Ada County defendants and Meridian City defendants filed Rule 12(b) Motions to Dismiss. (Dkt. 6, 7, 30.) On September 19, 2017, the Court granted in part and denied in part the Ada County defendants' Motions to Dismiss, and granted the Meridian City defendants' Motion to Dismiss. (Dkt. 59.) The claim of all plaintiffs were dismissed with the exception of Plaintiffs Drennon and Robert Coy. The year 2018 was dominated by disputes over discovery and access to the courts.

On January 18, 2019, the Court entered an Amended Case Management Order. (Dkt. 138.) For clarity and case management purposes, the Court severed Plaintiff Drennon's claims from Plaintiff Robert Coy's claims and ordered the Clerk of Court to file Plaintiff Drennon's Amended Complaint in a new action (this action). The Court further ordered Plaintiff Drennon's claims severed into different lawsuits, grouped by related claims and defendants, as required by Federal Rule of Civil Procedure 20. (*Id.*)

Pursuant to the Amended Case Management Order, this lawsuit encompasses only those claims in the Amended Complaint that correspond to the same claims in the original Complaint. (*Id.*, p. 11.)

To the extent that the original Complaint asserted claims against other Defendants that Plaintiff was ordered to, but did not, pursue in new, separate lawsuits, those claims will be dismissed without prejudice. Those claims include the following: (1) the claim that Plaintiff was not provided with proper medical care at ISCI and ISCC during the time period he was detained for the parole violations; (2) the claim that he was not provided with proper medical care at the Ada County Jail; (3) the claim that a state statute violated Plaintiff's constitutional rights; (4) the claim that certain Defendants colluded or conspired to deprive him of his protected rights; (5) all the access to courts and grievance claims against Ada County Defendants; (6) all the access to courts and grievance claims against the ISCC and ISCI, defendants and their attorneys; (7) medical and optical care claims for treatment that occurred since Plaintiff's new convictions; and (8) any ADA/RA claims against the state of Idaho or a state entity. (*Id.*, pp. 12-14.)

## PRELIMINARY MATTERS

Plaintiff asserts that he informed Defendants' counsel prior to his scheduled deposition that he was "taking several mind altering medications but she [Defendants' counsel] chose to continue with the deposition." (Dkt. 22-1, p. 4.) Plaintiff says he has very little memory of the deposition, and the deposition should have been halted and rescheduled. This characterization is not reflective of what happened at the deposition:

> Q. Are you on any medications or substances that can impair your ability to testify truthfully here today?
>
> A. Maybe, it depends. I take a plethora of medication. Okay? But I intend to be as truthful as possible to what I know. So it's not going to be

intentional if it's not.

Q. What medications are you on that may impair
your ability to testify truthfully?

A. There is an antidepressant. I don't remember
the name of it. It's a new one that they put me on.
And then there is the – it's a medication for pain, for
neuropathy. It will come to me in a minute. And then
there is some blood pressure meds that kind of kept me
in a loop, so -- but I should be okay.

Q. Do you have any mental impairments that affect
your memory?

A. Mental impairments?

Q. That affect your memory?

A. Other than medication, no.

(Dkt. 13-4, Deposition of Richard Drennon (hereinafter "Depo."), pp. 5-6.)

Plaintiff had an opportunity to request a review of the deposition, to make

any changes with an explanation for each change, and to sign the deposition. The

copy lodged with the Court does not contain a signature or any changes. (Depo.,

pp. 183-84.)  Nothing in the transcript demonstrates that Plaintiff was not able to

understand and respond appropriately to the questions posed. The Court will not

now entertain Plaintiff's complaints about how his mental or physical infirmities

may have affected the deposition. Plaintiff's objections are overruled.

## SUMMARY JUDGMENT STANDARD OF LAW

Summary judgment is appropriately entered when a party can show that, as to any

claim or defense, "there is no genuine dispute as to any material fact and the movant is

entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "[T]he mere existence of

*some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment ...." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). Rather, a case will survive summary judgment only if there is a *genuine* dispute as to a *material* fact. Material facts are those "that might affect the outcome of the suit." *Id.* at 248.

If the moving party meets its initial responsibility, then the burden shifts to the opposing party to establish that a genuine dispute as to any material fact actually does exist. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). The existence of a scintilla of evidence in support of the non-moving party's position is insufficient. Rather, "there must be evidence on which [a] jury could reasonably find for the [non-moving party]." *Anderson*, 477 U.S. at 252. If a party "fails to properly support an assertion of fact or fails to properly address another party's assertion of fact," the Court may consider that fact to be undisputed. Fed. R. Civ. P. 56(e)(2).

The Court does not determine the credibility of affiants or weigh the evidence set forth by the parties. Although all reasonable inferences which can be drawn from the evidence must be drawn in a light most favorable to the non-moving party, *T.W. Elec. Serv., Inc.*, 809 F.2d at 630-31, the Court is not required to adopt unreasonable inferences from circumstantial evidence, *McLaughlin v. Liu*, 849 F.2d 1205, 1208 (9th Cir. 1988).

Pro se inmates are exempted "from *strict* compliance with the summary judgment rules," but not "from *all* compliance." *Soto v. Sweetman*, 882 F.3d 865, 872 (9th Cir. 2018). In opposing a motion for summary judgment, a pro se inmate must submit at least "some competent evidence," such as a "declaration, affidavit, [or] authenticated

document," to support his allegations or to dispute the moving party's allegations. *Id.* at 873 (upholding grant of summary judgment against pro se inmate because the "only statements supporting [plaintiff's] ... argument are in his unsworn district court responses to the defendants' motion for summary judgment and to the district court's show-cause order").

The content of a verified amended complaint can serve as an affidavit in opposition to a motion for summary judgment to the extent the plaintiff's allegations are based on personal knowledge. *See Jones v. Blanas*, 393 F.3d 918, 923 (9th Cir. 2004) (allegations in a pro se plaintiff's verified pleadings must be considered as evidence in opposition to summary judgment); *Schroeder v. McDonald*, 55 F.3d 454, 460 (9th Cir. 1995) (verified complaint may be used as an affidavit opposing summary judgment if it is based on personal knowledge and sets forth specific facts admissible in evidence). However, "if a defendant moving for summary judgment has produced enough evidence to require the plaintiff to go beyond his or her pleadings, the plaintiff must counter by producing evidence of his or her own." *Butler v. San Diego Dist. Attorney's Office*, 370 F.3d 956, 965 (9th Cir. 2004).

In addition, the Prison Litigation Reform Act (PLRA)[1] requires the Court to screen all pro se prisoner pleadings to determine whether they have stated a claim upon which relief can be granted before such complaints are served on the defendants. 28 U.S.C. §§

---

[1] Pub. L. No. 104-134, 110 Stat. 1321, *as amended*, 42 U.S.C. § 1997e, *et seq.*

1915 & 1915A. The Court retains screening authority to dismiss claims at any time during the litigation under §1915(e).[2]

## DISCUSSION OF MOTION FOR SUMMARY JUDGMENT:
## PART ONE, PLAINTIFF'S TWELVE CLAIMS FOR RELIEF

### 1. First Claim for Relief

Plaintiff alleges that the Idaho parole statutes authorizing his placement in jail pending resolution of his parole violation charge, including Idaho Code § 20-229B, are unconstitutional because they allow parole officers to decide the length of time offending parolees must spend in jail (up to 90 days for a first violation, and up to 180 days for a second) and do not make allowances for disabled parolees to receive "the identical medical treatment Plaintiff received on the street under private care." (Dkt. 1, p. 16.) Plaintiff was ordered to bring this claim in a separate lawsuit if he desired to pursue it. He did not. This claim is subject to dismissal without prejudice.

### 2. Second Claim for Relief

Plaintiff asserts that Defendants intentionally interfered with his access to courts rights, resulting in the loss of three legal actions and the loss of over $200,000 in property. Plaintiff was ordered to bring this claim in a separate lawsuit if he desired to pursue it. He did not. This claim is subject to dismissal without prejudice.

---

[2] Notwithstanding any filing fee, or any portion thereof, that may have been paid, the court shall dismiss [an in forma pauperis] case at any time if the court determines that . . . the action or appeal . . . is frivolous or malicious. . . [or] fails to state a claim upon which relief may be granted." 28 U.S.C. § 1915(e)(2)(B).

### 3. Third Claim for Relief

Plaintiff asserts that Defendants intentionally interfered with his grievances so as to deprive him of a fair and timely grievance process. There is no constitutional right to a prison grievance system. Only if prison officials' action related to a grievance causes a prisoner to lose a cause of action does an access to courts claim lie. As mentioned directly above, Plaintiff was ordered to bring that claim in a separate lawsuit. He did not. The claim in this lawsuit will be dismissed without prejudice.

### 4. Fourth Claim for Relief

Plaintiff alleges that workers in the IDOC mailroom intentionally interfered with Plaintiff's incoming legal mail from Mrs. Drennon and Plaintiff Coy. Only letters to and from attorneys are classified as legal mail, but Plaintiff does have a right to have contact with the outside world, limited by prison security concerns. The Court previously notified Plaintiff that, if he desired to pursue an interference with mail claim, he must do so in a separate lawsuit. He did not do so. The claim in this lawsuit will be dismissed without prejudice.

### 5. Fifth Claim for Relief

Plaintiff alleges that the entity Defendants intentionally deprived him of necessary and adequate medical care, meaning care equal to that which he received from medical providers outside the jail and prison systems. Plaintiff was ordered to bring such a claim in a separate lawsuit. He did not. The claim in this lawsuit will be dismissed without prejudice.

### 6. Sixth Claim for Relief

Plaintiff alleges that Defendants deprived him of the "ability to respond to the pleadings filed by all the initial Defendants in this lawsuit… and, as a result of this interference, Plaintiff Drennon was unable to file responses, objections or any form of challenge to these pleadings, and, as a result, the Court issued decisions without Plaintiff Drennon being able to respond." (Dkt. 1-1, p. 20.) Plaintiff was ordered to bring such a claim in a separate lawsuit. He did not. The claim in this lawsuit will be dismissed without prejudice.

### 7. Seventh Claim for Relief

The seventh cause of action that Defendant "'Commission of Paraobation [sic] and Parole' violated Plaintiff Drennon's right to a fair and impartial revocation of parole process by allowing a named Defendant, Brood, to engage Plaintiff in a bogus form of parole hearing." (Dkt. 1-1, p. 47.) Plaintiff has brought forward insufficient evidence to support his allegation that the parole revocation hearing process was bogus. The parole revocation statutes provide that a parole revocation hearing may be conducted by members of the Commission, a member of the Commission, or a designated Parole Hearing Officer, like Brood. *See* I.C. § 20-229B.

Regardless, Plaintiff's claims against the Commission are subject to dismissal. The Eleventh Amendment prohibits litigants from bringing suits for monetary damages against state agencies and state officials acting in their official capacity. *Puerto Rico Aqueduct & Sewer Auth. v. Metcalf & Eddy, Inc*., 506 U.S. 139 (1993). All claims for monetary damages asserted against the state entities—Idaho Board of Correction (IBOC),

District Four Parole, and the Idaho Commission of Pardons and Parole—are barred by Eleventh Amendment sovereign immunity. These claims will be dismissed for failure to state a federal claim upon which relief can be granted.

In addition, Plaintiff asserts that the parole violation charges were based upon "fabricated, falsified" evidence allowed by the Commission to retaliate against Plaintiff for exercising his right to access the courts. This allegation does not implicate the "form" of the hearing, but the basis of the charges.

Certain types of parole claims may be brought as § 1983 claims; others must be asserted in habeas corpus actions. In *Wilkinson v. Dotson*, 544 U.S. 74 (2005), the Supreme Court held that an inmate may initiate a § 1983 action to seek invalidation of "state procedures used to deny parole eligibility . . . and parole suitability," but he may not seek "an injunction ordering his immediate or speedier release into the community." *Id*. at 82. In *Heck v. Humphrey*, 512 U.S. 477, 481 (1994), the Court held that a prisoner in state custody cannot use a civil rights action to challenge the fact or duration of his confinement. *Id.* at 481. In addition, the *Dotson* Court further clarified that a state prisoner's § 1983 action is barred (absent prior invalidation)—no matter the relief sought (damages or equitable relief), no matter the target of the prisoner's suit (state conduct leading to conviction or internal prison proceedings)—if success in that action would necessarily demonstrate the invalidity of confinement or its duration. *Id*. at 81-82.

Here, if this Court were to decide that Plaintiff's parole revocation and subsequent re-incarceration were based upon fabrication, falsification, and/or retaliation, that decision would call into question the factual grounds for the parole violation and

revocation. Despite the way Plaintiff has framed his claim to bypass the *Heck b*ar, Plaintiff's claims are not among those authorized by *Dotson* – that is, his claims do not seek invalidation of "*state procedures* used to deny parole eligibility . . . and parole suitability." *Id.* at 82 (emphasis added). The Seventh Claim will be dismissed without prejudice.

### 8. Eighth Claim for Relief

Plaintiff says he notified the Ada County [state] Court of his access to the courts issues caused by the interference of Ada County Jail and IDOC personnel, but the Ada County Court did nothing to remedy the problems. Instead, "Plaintiff Drennon was unconstitutionally convicted." (Dkt. 1-1, p. 48.) If he refers to his parole conviction, the claim must be brought in habeas corpus. Regardless, Plaintiff was ordered to bring this claim in a separate lawsuit if he desired to pursue it. He did not. This claim in this lawsuit will be dismissed without prejudice.

### 9. Ninth Claim for Relief

Plaintiff alleges that IDOC Defendants, counsel, and paralegals engaged in intentional acts to deprive Plaintiff of attending scheduled telephonic hearings in this lawsuit, unnecessarily interfering with Plaintiff's right to access the Court. The Court does not condone any circumstances in which the IDOC failed to ensure that Plaintiff was at the right location at the right time so as to participate telephonically in a scheduled telephone hearing, but in each such case the hearing was either rescheduled or some other accommodation was made to ensure that he suffered no prejudice to his case. There is no showing that he suffered any harm from those instances where the originally scheduled

hearing did not go forward because IDOC failed to make certain the Plaintiff was where he needed to be at the time of the telephone hearing. In any event, here also the Court ordered Plaintiff to bring such claims in a separate lawsuit if he desired to pursue them. He did not. This claim will be dismissed without prejudice.

10. **Tenth Claim for Relief**

Plaintiff asserts that the ISCC facility is not ADA or RA compliant. The Court ordered Plaintiff to bring such claims in a separate lawsuit against the state or appropriate state entity if he desired to pursue them. He did not. This claim will be dismissed without prejudice.

11. **Eleventh Claim for Relief**

Plaintiff asserts that the IDOC legal resource centers are inadequate in their coverage of foreclosure laws, causing him to lose investment property of over $200,000. The right to access the courts right does not cover foreclosures, only actions that challenge convictions and prison conditions civil rights claims. This claim will be dismissed for failure to state a federal claim upon which relief can be granted.

12. **Twelfth Claim for Relief**

Plaintiff alleges that Defendants caused him to "suffer from the chill effort resulting in Plaintiff Drennon being fearful of pursuing grievances and other avenues of redress of grievances for fear of being verbally, physically & psychologically injured, due to the lack of adequate medications Plaintiff Drennon received prior to incarceration." Plaintiff was previously instructed to bring all grievance-related claims in a separate lawsuit. He did not. This claim will be dismissed without prejudice.

**DISCUSSION OF MOTION FOR SUMMARY JUDGMENT:**
**PART TWO, PLAINTIFF'S UNIDENTIFIED CLAIMS ARISING FROM HIS**
**"SUPPORTING FACTS" ALLEGATIONS IN THE AMENDED COMPLAINT**

If only the twelve "Claims for Relief" set forth in Plaintiff's Amended Complaint (Dkt. 1) were to be decided, the Court would end its analysis now and dismiss the Amended Complaint. However, the Court has liberally construed the Amended Complaint to contain "claims" that can be extrapolated from the "Supporting Facts" section of the Amended Complaint, supplemented by Plaintiff's explanations he gave in deposition in March 2019.

**1. Absolute Quasi-Judicial Immunity: Actions related to Hearing**

Plaintiff was charged with violating Special Condition #4 of his Parole Agreement, which required that he submit to a polygraph test at the request of treatment providers and/or supervising personnel. On January 20, 2016, Defendant Steve Brood conducted Plaintiff's parole violation hearing. Plaintiff entered a guilty plea.

Defendant Brood asserts entitlement to absolute quasi-judicial immunity from suit regarding Plaintiff's claims against him. The Ninth Circuit has outlined the absolute immunity analysis to be used for parole board member and parole officer defendants in *Swift v. California*, 384 F.3d 1184 (9th Cir. 2004):

> The Supreme Court has reserved deciding whether members of state parole boards have absolute quasi-judicial immunity for their official actions. *Martinez v. California*, 444 U.S. 277, 285 n. 11, 100 S.Ct. 553, 62 L.Ed.2d 481 (1980). We have held, however, that parole board members are entitled to absolute immunity when they perform "quasi-judicial" functions. *Anderson* [*v. Boyd*], 714 F.2d, 906 909-10 (9th Cir. 1983). Thus, parole board officials … are entitled to absolute quasi-judicial immunity for decisions "to grant,

deny, or revoke parole" because these tasks are "functionally comparable" to tasks performed by judges. *Sellars*, 641 F.2d at 1303; *Bermudez v. Duenas*, 936 F.2d 1064, 1066 (9th Cir.1991) (holding *Sellars* immunity encompasses actions "taken when processing parole applications"). Absolute immunity has also been extended to parole officials for the "imposition of parole conditions" and the "execution of parole revocation procedures," tasks integrally related to an official's decision to grant or revoke parole. *Anderson*, 714 F.2d at 909.

We have also explained, however, that parole officials are not "entitled to absolute immunity for conduct not requiring the exercise of quasi-judicial discretion." *Id*. "There is no reason to clothe actions taken outside an official's adjudicatory role with the absolute immunity tailored to the demands of that role." *Id*. Thus, while parole officials "may claim absolute immunity for those actions relating to their responsibility to determine whether to revoke parole, their immunity for conduct arising from their duty to supervise parolees is qualified." *Id*. at 910; *see also Sepulveda v. Ramirez*, 967 F.2d 1413, 1415-16 (9th Cir. 1992) (holding that a parole officer was not entitled to qualified immunity for depriving a woman of her clearly established due process right to bodily privacy by entering a bathroom stall and watching her urinate). *Anderson*, therefore, expresses the broad principle that, under a functional analysis, parole officials "may be accorded one degree of immunity for one type of activity and a different degree for a discrete function." *Anderson*, 714 F.2d at 910.

*Id*. at 1188-1189. *Swift* overruled any prior interpretation of *Anderson v. Boyd* that the test for absolute immunity is only whether the act "relates to" the decision to grant, deny, or revoke parole. *Id*. at 1190.

The Court will now address Plaintiff's claims for which Defendant Brood asserts absolute quasi-judicial immunity.

### A.    Conducting a "Bogus Parole Hearing"

Plaintiff alleges that he was forced to "engage in a bogus parole hearing at the hands of defendant Brood." (Depo., p. 177.) This claim centers on the procedures and content of the parole hearing, and, thus, even if it was "bogus," Brood is entitled to absolute quasi-judicial immunity. *Cf. Ashelman v. Pope*, 793 F.2d 1072, 1075 (9th Cir. 1986) (Once it is determined that a judge was acting in his judicial capacity, absolute immunity applies, "however erroneous the act may have been, and however injurious in its consequences it may have proved to the plaintiff."); *Moore v. Brewster*, 96 F.3d 1240, 1244 (9th Cir. 1996) (superseded on other grounds by California statute) (quoting *Ashelman v. Pope*, 793 F.2d at 1078) (judicial immunity is not lost "by allegations that a judge conspired with one party to rule against another party: 'a conspiracy between judge and [a party] to predetermine the outcome of a judicial proceeding, while clearly improper, nevertheless does not pierce the immunity extended to judges.'"). This claim will be dismissed with prejudice.

### B.    Failure to Allow Plaintiff to Call Witnesses

Plaintiff also alleges that "they" (unclear as to the defendants) denied him the right to call witnesses to challenge his accusers. He alleges he asked Brood or another person in authority if he could call certain witnesses, and "they" said no. (Depo., p. 126.) Plaintiff agreed in his deposition that this course of action was *not* outside the hearing process. *Id*. Defendant Brood's (or any other Defendant's) responsibilities and acts in deciding which witnesses to allow, weighing evidence, and deciding the merits of the parole violations arise from the quasi-judicial work as a parole hearing officer. These acts

are encompassed by absolute quasi-judicial immunity and will be dismissed with prejudice.

### C.    *Impartial Hearing Officer*

When asked in deposition why Brood was included in the lawsuit, Plaintiff responded, "I think he lacks complete impartiality when it comes to me." (Depo., p. 36.) Brood's impartiality as the factfinder in this matter is an integral part of the hearing process. While perhaps Plaintiff is skeptical about Brood's impartiality in not permitting Plaintiff to call the witnesses of his choice, both *Ashelman v. Pope* and *Moore v. Brewster* hold that a factfinder's impropriety or bad faith is not considered in the analysis—only whether he or she was functioning in a quasi-judicial role. Because a charge of impartiality is aimed at the factfinding in the quasi-judicial hearing at issue, Brood is entitled to absolute immunity. This claim will be dismissed with prejudice.

### D.    *Denial of Access to Hearing Panel*

Plaintiff alleges that Brood, along with Defendant Vorhes, "deprived [him] of his adequate access to hearing panel that was impartial and would review the records requested for a determination of plaintiff's claims being accurate, in regards to funding the polygraph test." (Dkt. 125, p. 17.) Plaintiff explained in deposition that he meant he requested to meet with the Parole Board, rather than have a parole hearing officer decide the violation. (Depo., p. 126.)

Plaintiff has brought forward nothing showing *who* assigned his case to be heard by Brood instead of by a Commission member or the entire Commission, *why* he believes he was entitled to go before the Commission rather than a parole hearing officer, and

*whether* Vorhes and Brood had the authority or acted to have Plaintiff appear before

Brood rather than the Commission. The governing statute permits a Commission

member, members, or a parole hearing officer to conduct parole violation hearings. *See*

I.C. § 20-229B.

In any event, inasmuch as assignment of a factfinder to a case is an integral part of

the judicial process, Brood and Vorhes are entitled to absolute quasi-judicial immunity, if

they, in fact, participated in assigning Plaintiff's parole violation hearing to Brood, an

authorized parole hearing officer. In *Martinez v. Winner*, 771 F.2d 424 (10th Cir. 1985),[3]

the "complaint state[d] that Judge Winner assigned himself, in contravention of local

practice and rules, to preside at the Martinez criminal trial, for the purpose of insuring a

conviction." *Id*. at 434. The court held that "[a]lthough it is an 'administrative' act, in the

sense that it does not concern the decision who shall win a case, the assignment of cases

is still a judicial function in the sense that it directly concerns the case-deciding process."

*Id*.

Alternatively, these allegations fail to state a claim upon which relief can be

granted for failure to show personal participation of Brood and Vorhes, because there are

no facts in the record showing they had any authority over such a decision, or even, in the

absence of authority, that they acted as Plaintiff alleges.

To the extent Plaintiff's term "they" (referring to the person or persons who

assigned the case to Brood) means that the Commission is responsible for assigning a

---

[3] *Martinez* was vacated on other grounds *sub nom. Tyus v. Martinez*, 475 U.S. 1138 (1986).

parole hearing officer to Plaintiff's case, claims against individual Commission members are barred by absolute quasi-judicial immunity, and claims against the Commission itself for resulting damages are barred by Eleventh Amendment sovereign immunity, as discussed elsewhere above. This claim, in all of its forms, will be dismissed with prejudice.

###### E.   *Stalking, Harassment and Retaliation Claims Against Defendant Brood*

In response to deposition questioning about the vague allegations in paragraph 47 of the Amended Complaint (Dkt. 1), Plaintiff asserted that Defendant Brood was one of the unnamed parole officers who engaged in "interfering with and stopping plaintiff Drennon from engaging in voluntary assistance to individuals needing to read and understand the law, as well as stalking and harassing plaintiff Drennon beginning between 2013 and 2015." (Depo., p. 57.)

The first clarification Plaintiff made in deposition was that some of the stalking, harassment, and retaliation claims arose from statements Brood made during the hearing process:

> Q.   I just want to make sure I understand. So from 2013 to 2015, Steve Brood stalked and harassed you by his participation as the hearing officer through the parole violation process, whether that's serving the parole violation, or acting in the capacity of a hearing officer; is that correct?
>
> A. That's correct.
>
> Q. Anything else?
>
> A.   With his statements involved in that, yes, it's very obvious. No. I'm going to say, no, at this point. Now,

> there are other things that I will bring forth to you later
> if l find them, but...

> Q.    As we sit here today, that's --

> A.    Yes, that's good.

> Q.    That's the extent of it?

> A.    Yes.

(Depo., p. 78.)

Because such statements were made in the course of the parole violation hearing proceedings where Brood was the quasi-judicial officer, he is entitled to absolute quasi-judicial immunity for these claims. They will be dismissed with prejudice.

The second type of stalking, harassment, and retaliation Plaintiff complained of in deposition was that Brood made several statements to him during service of process of a parole violation. These statements made outside of the parole hearing process would not be covered by absolute quasi-judicial immunity.

> Q.    How did he stalk and harass you, as it relates to
>       paragraph 47 of your complaint?

> A.    His comments during the service process of the
>       parole violations, okay? "Told you we would
>       get your ass," quote. "Told you." He made it
>       very clear he was out to get me.

(Depo., p. 77.)

Also at deposition, when asked whether Brood did anything outside of the scope of the parole violation hearing that violated Plaintiff's constitutional rights, Plaintiff again answered only: "Well, Brood was like this, told you we would get you doing this type of shit, the behavior." (Depo., pp. 128-29.)

To state a stalking, harassment, or retaliation claim, a plaintiff must provide sufficient factual allegations that are more than "merely consistent with a defendant's liability"; otherwise, the complaint has not stated a claim for relief that is plausible on its face. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotation marks omitted). Brood's words can be construed as a statement that he had warned Plaintiff earlier that he would catch him in parole violations—a construction that does not support any of Plaintiff's claims. The words can also be construed as harassment or retaliation; however, Plaintiff has not presented *other* supporting facts that would place Brood's statement beyond being *merely consistent* with potential liability.

The Court has scoured the record for additional facts, but has found none. There are no corresponding factual allegations in the Amended Complaint specific to Brood, and no date or context for these comments in the deposition transcript or anywhere else in the record. There are no factual allegations connecting Brood to any retaliatory action— for example, there are no allegations showing how Brood knew of Plaintiff's First Amendment activity or why Brood had a personal interest or stake in Plaintiff's activity such that he had any motivation to retaliate. "[B]are allegations" of a retaliatory motive are insufficient to support a retaliation claim. *Rizzo v. Dawson*, 778 F.2d 527, 532 n.4 (9th Cir. 1985); *see also Wood v. Yordy*, 753 F.3d 899, 905 (9th Cir. 2014) ("We have repeatedly held that mere speculation that defendants acted out of retaliation is not sufficient.").

As to the stalking and harassment allegation, Plaintiff does not specify facts about how or when Brood stalked and harassed him. Verbal abuse alone is not sufficient to state

a civil rights claim. *See Oltarzewski v. Ruggiero*, 830 F.2d 136 (9th Cir. 1987) (allegations that correctional counselor told plaintiff that he would transfer him to a higher custody status unit if he tried to go to the law library and that he would be sorry if he filed a class action suit were not actionable under section 1983).

Plaintiff has attempted to explain his allegations in his deposition, but has stated no set of facts that would support the elements of a retaliation, stalking, or harassment claim. Even if the Court considers the deposition testimony as supplementing the Amended Complaint, the totality of allegations fail to state a claim upon which relief can be granted. Plaintiff has had adequate time to obtain discovery and evidence to support his claims, and he has not done so. Accordingly, these claims will be dismissed with prejudice.

**2. Absolute Quasi-Judicial Immunity: Imposing Parole Conditions**

Many of the claims that the Court will discuss later under the qualified immunity section of this Order are, in fact, subject to dismissal on the basis of absolute quasi-judicial immunity. Absolute immunity "extend[s] to parole officials for the 'imposition of parole conditions'" because that task is "integrally related to an official's decision to grant or revoke parole," which is a "quasi-judicial" function. *Thornton v. Brown*, 757 F.3d 834, 840 (9th Cir. 2013) (citing *Swift v. California*, 384 F.3d 1184, 1189 (9th Cir. 2004) and *Anderson v. Boyd*, 714 F.2d 906, 909 (9th Cir. 1983)). Where "parole conditions currently in effect" are "imposed through particularized and discretionary decisions by parole officers," absolute immunity applies. *Id*.

Plaintiff complains that, after giving him several chances to take a polygraph test as required by his parole agreement, Defendants chose to charge Plaintiff with a violation of parole. Significantly, Plaintiff admits he violated conditions of his parole in this manner but claims that he did so with an excuse. The excuse is not relevant to Defendants' authority to exercise discretion to enforce the parole condition. Therefore, Defendants are entitled to absolute immunity.

The same analysis holds as to Plaintiff's complaints that (1) while living in a house that was in foreclosure proceedings and having been served with an eviction notice, he was charged with a violation of not having a place to live, and that (2) his new parole officer chose to revoke permission for Plaintiff to have the type of cell phone that violated the parole agreement, even if prior parole officers had orally agreed that he could have it. Defendants are entitled to absolute immunity because these are questions of imposition of parole conditions that required the exercise of discretion. These claim will be dismissed with prejudice.

### 3. Qualified Immunity

Absolute immunity does *not* extend to claims that parole officers imposed or enforced the conditions of parole in an unconstitutionally arbitrary or discriminatory manner. However, parole officers may be covered under the umbrella of qualified immunity "for conduct arising from their duty to supervise parolees." *Anderson v. Boyd*, 714 F.2d at 910.

The individual defendants assert entitlement to qualified immunity. Even if a plaintiff shows a violation of a constitutional right under § 1983, a defendant may be

entitled to summary judgment based on qualified immunity. The doctrine of qualified immunity protects state officials from personal liability for on-the-job conduct so long as the conduct is objectively reasonable and does not violate an inmate's clearly-established federal rights. *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). Contrarily, a state official may be held personally liable in a § 1983 action if he knew or should have known that he was violating a plaintiff's clearly-established federal rights. *Id*. True to its dual purposes of protecting state actors who act in good faith *and* redressing clear wrongs caused by state actors, the qualified immunity standard "gives ample room for mistaken judgments by protecting all but the plainly incompetent or those who knowingly violate the law." *Hunter v. Bryant*, 502 U.S. 224, 227 (1991) (quotation omitted).

A qualified immunity analysis consists of two prongs: (1) whether, "[t]aken in the light most favorable to the party asserting the injury, ... the facts alleged show the [defendant's] conduct violated a constitutional right"; and (2) whether that right was clearly established. *Saucier v. Katz*, 533 U.S. 194, 201 (2001), *modified by Pearson v. Callahan*, 555 U.S. 223 (2009). Courts may "exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Pearson*, 555 U.S. at 236.

To determine whether the right was clearly established, a court turns to Supreme Court and Ninth Circuit law existing at the time of the alleged act. *Osolinski v. Kane*, 92 F.3d 934, 936 (9th Cir. 1996). In the absence of binding precedent, the district courts should look to available decisions of other circuits and district courts to ascertain whether the law is clearly established. *Id.*

The inquiry of whether a right was clearly established "must be undertaken in light of the specific context of the case, not as a broad general proposition." *Saucier*, 533 U.S. at 201. For the law to be clearly established, "[t]he contours of the right must be sufficiently clear that a reasonable official would understand" that his conduct violates that right. *Anderson v. Creighton*, 483 U.S. 635, 640 (1987). A governmental official "cannot be said to have violated a clearly established right unless the right's contours were sufficiently definite that any reasonable official in the defendant's shoes would have understood that he was violating it." *Plumhoff v. Rickard*, 572 U.S. 765, 778-79 (2014). *See also Saucier*, 533 U.S. at 202 ("The relevant, dispositive inquiry is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted.").

In addition, once a court determines that the constitutional right at issue was, in fact, clearly established, the court must then consider whether—*despite* the clearly-established nature of the right—a reasonable prison official still "could have believed the conduct was lawful." *Schroeder v. McDonald*, 55 F.3d 454, 461 (9th Cir. 1995).

Application of qualified immunity is appropriate where "the law did not put the [defendant] on notice that his conduct would be clearly unlawful." *Id.* Although the Supreme Court's qualified immunity jurisprudence "does not require a case directly on point for a right to be clearly established, existing precedent must have placed the statutory or constitutional question beyond debate." *Kisela v. Hughes*, 138 S.Ct. 1148, 1152 (2018). However, if there is a genuine dispute as to the "facts and circumstances within an officer's knowledge," or "what the officer and claimant did or failed to do,"

summary judgment is inappropriate. *Act Up!/Portland v. Bagley*, 988 F.2d 868, 873 (9th Cir. 1993).

In *Smith v. City of Oakland*, the United States District Court for the Northern District of California provided an excellent summary of the law governing claims of harassment brought against parole officers:

> In *Samson [v. California*, 547 U.S. 843, 125 S.Ct. 2193 (2006)], the Supreme Court addressed the issue of whether a suspicionless parole search, conducted under the authority of California Penal Code § 3067(a), violates the Fourth Amendment. *See id.* at 2196.... [T]he Court concluded that a suspicionless parole search does not necessarily violate the Fourth Amendment. *See id.* at 2198–2201. Nonetheless, the Court did not hold such searches were without any constitutional protection. As to "[t]he concern that California's suspicionless search system gives officers unbridled discretion to conduct searches," the Court stated that this was "belied by California's prohibition on 'arbitrary, capricious or harassing' searches." *Id.* at 2202. Importantly, the Supreme Court cited, inter alia, California Penal Code § 3067(d), which provides that "[i]t is not the intent of the Legislature to authorize law enforcement officers to conduct searches for the sole purpose of harassment." Cal. Pen.Code § 3067(d) (emphasis added); *see also In re Anthony S.*, 4 Cal.App.4th 1000, 1004, 6 Cal.Rptr.2d 214 (1992) (stating that a search condition justifies a warrantless search, but that there are exceptions, e.g., "where the search exceeds the scope of the consent, is conducted in an unreasonable manner, is undertaken for harassment or is '... for arbitrary or capricious reasons'"; adding that the word "arbitrary" relates to an officer's motivation—i.e., "[w]here the motivation is unrelated to rehabilitative and reformative purposes or legitimate law enforcement purposes, the search is 'arbitrary'") (emphasis added). Thus, pivotal to the Court's permitting suspicionless searches of parolees was the safeguard that such searches may not be arbitrary, capricious, or harassing—e.g., motivated by the "purpose of harassment." Accordingly, while the existence of objective probable cause or individualized reasonable suspicion may obviate inquiry

> into subjective motives..., where there is no such objective
> protection, parolees subject to suspicionless searches are
> entitled to at least protection against searches initiated for
> arbitrary, capricious, or harassing reasons under *Samson*.

538 F.Supp.2d 1217, 1226-27 (N.D. Ca. March 17, 2008).

The foregoing case law is focused on whether *searches* amount to harassment. So, too, does recent case law from the United States Court of Appeals for the Ninth Circuit focus on searches. *See United States v. Johnson*, 875 F.3d 1265 (9th Cir. 2017) (addressing warrantless searches of the contents of a parolee's cell phone); *United States v. Korte*, 918 F.3d 750 (9th Cir. 2019) (permitting a warrantless search of the trunk of a parolee's car). While these cases were not in existence at the time Plaintiff's parole officers acted, they do show the continuing trend of addressing *searches* and addressing parolees' *privacy interests*. As described in *Johnson*, the Ninth Circuit  has "repeatedly recognized that status as a parolee significantly diminishes one's privacy interests as compared to the average citizen." *Id*. at 1273.

All of Plaintiff's claims arise from the imposition or enforcement of parole conditions notwithstanding Plaintiff's claims of poverty, and are unrelated to case law governing searches and privacy rights. The Court has found no decisions prohibiting parole officers from enforcing parole conditions even where a parolee cannot afford to pay for mandatory testing. Therefore, Defendants did not have notice of any clearly established, existing precedent that placed the constitutional question at issue beyond debate at the time they made their decisions regarding Plaintiff. Even today, no governing

law exists that clearly and specifically applies to Plaintiff's claims. Therefore, as discussed in more detail below, Defendants are entitled to qualified immunity.

Plaintiff signed a parole agreement which granted parole on January 16, 2008. (*See* Affidavit of Janae Vorhes, Dkt. 13-8, p. 3 & Exhibit A.) Plaintiff agreed with "all its terms and conditions and with the understanding that the Commission of Pardons and Parole could, at any time, in case of violations of the terms of parole, cause the parolee to be returned to an institution to serve the full maximum sentence or any part thereof." (Dkt. 13-8 & Exhibit A.)

Included in Plaintiff's parole agreement was Special Condition 4: "Submit to a polygraph and/or plethysmographic testing at the request of the treatment providers and/or supervising personnel." (*Id*.) Plaintiff also agreed to other conditions, including "that he would obtain written permission to possess or use any electronic device that had a digital camera or internet connectivity functionality (IDOC 19); that he consented to the search of his person, residence personal property and other real property (IDOC 23); that he would make payments for his monthly cost of supervision bill (IDOC 23-24); and that he would cooperate with supervision (IDOC 25)." (*Id*.) Plaintiff "agreed to abide by and conform to [the parole conditions] strictly, and fully understood that his failure to do so could result in revocation of his parole. (*Id*.)

### A. Defendants' Act of Charging Plaintiff with a Parole Violation for Nonpayment of a Polygraph Test

Plaintiff alleges that the individual parole official defendants knew he could not afford to pay for a polygraph test and yet failed to suggest that he could apply for

indigent help in the form of "transitional funding or other available funding," and failed to give him additional time to pay for the polygraph test, but instead chose to issue him a parole violation. (Dkt. 1, pp. 15-16.) He further alleges that they knew he qualified for funding to help pay for the test because he was on disability without means to pay for it.

Plaintiff does not contest the chronology set forth by Vorhes regarding the several times she asked him to schedule a polygraph, and he simply did not. It does not matter that on the day of his arrest, he claims that his wife was ready to pay for the polygraph test. Plaintiff did not comply at least three times with his parole officer's request to schedule a polygraph and did not act to correct the violation before Vorhes enforced the provision.

Further, Plaintiff has not brought forward facts showing that indigent or low-income funding was available to him. He has not provided his financial records from that time period. He also paid for and took polygraph tests regularly in prior years.

Further, the record shows that Plaintiff did, in fact, have assets. Plaintiff alleges that, "[a]fter being released from the unconstitutional parole sanction issued by Defendant Vorhes, Plaintiff discovered that his office equipment and supplies had been sold off by Plaintiff's staff, and that the only items remaining were a few legal research books and Legal CDs." (Dkt. 1, p. 21.) He asserts that his office equipment and supplies were worth about $25,000. While he implied that his employees did this without his permission and did not pass any of the proceeds along to him, in deposition he clarified that his wife was the office manager and his daughter was the secretary. (Depo, pp. 144-45.) Plaintiff does not show why he could not have sold something to pay for the

polygraph test if his office equipment was worth $25,000. (Dkt. 1, p. 21.) Elsewhere in his deposition, Plaintiff said he had $30,000 to $50,000 in property for his business. (Depo., p. 131-32.) In addition, in Claim Eleven, Plaintiff asserts that the inadequacy of IDOC legal resource centers caused him to lose investment property of over $200,000.

Regardless of whether Plaintiff had any money, assets, or friends to lend him funds, Defendants are entitled to qualified immunity. There is no case law supporting Plaintiff's claims that would have put Defendants on notice that they were acting in an unconstitutional manner by not suggesting alternative means of paying his testing fees and instead holding him to his parole agreement in the face of his claims that he was living on SSI. This claim will be dismissed with prejudice.

### B. Defendant Vorhes' Alleged Act of Forcing Plaintiff to Use his Disability Income to Pay for Cost of Supervision and Polygraph Tests

As discussed above, Plaintiff has provided no case authority to demonstrate that Vorhes was on notice that she was required to exempt him from paying the costs of his supervision and polygraph tests because he was on SSI. The facts show that Plaintiff had personal property and other resources he could have tapped into to pay his costs. Regardless, Vorhes is entitled to qualified immunity on this claim, and this claim will be dismissed with prejudice.

### C. Defendant Vorhes Allegedly Denied Plaintiff Transitional Funding to Pay for Polygraph Testing

As stated above, Plaintiff has provided no evidence that transitional funding was available to him; that he would have qualified for it, given that he had a substantial amount of personal property, including investment property valued at over $200,000; or that Vorhees denied him such funds, if any existed. There are not enough facts to support any type of claim. In addition, there is no case law showing that these allegations amount to a constitutional violation. Vorhes is entitled to summary judgment on qualified immunity grounds, and, alternatively these vague allegations fail to state a claim upon which relief can be granted. This claim will be dismissed with prejudice.

### D. Defendants' Alleged Harassment and Interference with Business

#### 1) Cell Phone

Plaintiff alleges that Vorhes searched his home on the morning of July 16, 2016, at approximately 7:15 a.m., but could find nothing for which to arrest him. (Dkt. 1, p. 20.) Instead, Vorhes said Plaintiff did not have authorization for a smartphone. He alleges that she did this to interfere with his business, because Plaintiff had been authorized to have a smartphone for over five years prior to that date. "Voorhees was trying to find anything she could just to come up with something to violate me on. Instead of trying to help me on parole, she was trying to keep me off of parole. That's how I felt. She was stalking me by doing that," alleges Plaintiff. (Depo., p. 62.)

Vorhes' alleged stalking and harassment consisted of identifying parole violations and "not taking into consideration the extenuating circumstances surrounding any

violation." (*Id.*, p. 63.) Plaintiff does not identify any other searches or other forms of harassment that Vorhes carried out.

As to his possession of the phone, Plaintiff admitted in deposition that his parole agreement contained this term: "Special Conditions: Obtain written permission to possess or use any electronic device." (Depo., p. 119.) Plaintiff agreed that written permission was required, but said the IDOC and parole commission had a history of saying, "Well, don't worry about it right now. You can have it." (Depo., pp. 119-20.)

It is undisputed that Vorhes was new to Plaintiff's case. There is nothing in governing case law that provides Vorhes with notice that, if past parole officers had not enforced each and every provision of the parole agreement, she was bound to do the same. Accordingly, Vorhes has qualified immunity for her efforts to bring Plaintiff into compliance with the actual written and signed parole agreement.

### 2) Interference with Plaintiff's Business

The Court also considers whether Defendants interfered with Plaintiff's business, "Justice Barred," by harassing him and preventing him from operating his business. Plaintiff's only factual allegations are that Vorhees searched his house once, took his cell phone, and had him arrested for not taking a polygraph test—all actions authorized by the parole agreement. Plaintiff has not stated sufficient facts to support a claim that Defendants did anything else to harm Plaintiff's business.

Although Plaintiff has had plenty of time to come forward with facts supporting his position that Defendants purposely interfered with his business out of a motive to thwart his efforts to provide legal help to persons who were alleging civil rights

violations against government officials, he has provided no set of specific facts to meet the elements of such a claim. Plaintiff alleges that Defendants' stalking and harassing caused him to have to close his business, but the deposition showed otherwise.

For example, Plaintiff admits he had a judgment entered against him for $19,275 for failure to provide workers compensation insurance to his employees. (Depo., p. 86.) When asked about that during the deposition, Plaintiff testified:

> Q. Was it the Industrial Commission lawsuit that forced you to close Justice Barred, LLC?
>
> A. I chose to close Justice Barred, correct.
>
> Q. Okay.
>
> A. That was part of it, yes.

(Depo., p. 97.)

In addition, Plaintiff testified:

> Q. What income were you deprived of?
>
> A. The MAXIMUS program, the businesses, I was deprived from having a business. I was getting --
>
> Q. How much money --
>
> A.  I was getting -- working to get off of it. I was living on my Social Security. The business could have kept going, and could have kept prospering without being interfered with by the parole commission, I would have still had that business still going to this day.
>
> Q. How much money --
>
> A. None.
>
> Q. -- were your businesses making?
>
> A. They were losing.

> Q.     How much money were you being paid by your businesses?
>
> A.     None. It doesn't mean that I'm not trying to get out of that, though. I was trying to get it to where it paid me.
>
> Q.     And you voluntarily closed Justice Barred, LLC?
>
> A.     Uh-huh, I closed them all.

(Depo., pp. 120-21.)

The facts are undisputed that Plaintiff was violating conditions of parole when Vorhes took over supervision of his case, and that Plaintiff did not correct those violations, even though he was given notice and time to do so. Plaintiff has cited to no case law, and the Court has found none, showing that Vorhes was on notice that she should have taken into consideration whether requiring Plaintiff to come into compliance with his parole conditions would affect his business. Vorhes is entitled to qualified immunity on these claims. Vorhes is also entitled to summary judgment on Plaintiff's claims of stalking and harassing for lack of supporting facts. These claims will be dismissed with prejudice on qualified immunity and failure-to-state-a-claim grounds.

### 4.  Claim Two: Interference with Alleged Right to Practice Law

Plaintiff asserts that he has a right to provide paralegal services to others, and that Defendants interfered with that right. Plaintiff has provided no case law showing that Defendants were required to overlook his parole violations so as not to interfere with his efforts to help others in his paralegal-type business. Defendants are entitled to qualified immunity on this claim, and it will be dismissed.

### 5.  Claim Three: Failure to Provide Adequate Health Care; Jail Conditions

Plaintiff brings various subclaims related to an alleged failure to provide adequate health care to him arising from his placement in the Ada County Jail awaiting the outcome of his parole violation charges. He more fully explained the factual basis for his claims in his deposition:

> Q.  So how were you deprived of medication at the Ada County Jail?
>
> A.  Darn. Okay. Gosh. Like all county jail and prison facilities you go into, you meet with the provider as soon as possible to make sure you got your chronic care stuff taken care of. The Ada County Jail providers flat just refuse to give me the medication that my wife brought to them. That was, I'm supposed to have. They just refused to give it to me, not because it wasn't there. But because they say, we don't provide. We don't allow you to have this medication. Okay. I'm sorry. This is what I have on the street. This is what I am supposed to have to stay alive. Why are you not giving me my meds? Okay? And they just would not. I mean, I got six meds out of the 40, and it messed me up bad. It's still messing me up.
>
> Q.  And Ada County, it's your understanding that Ada County Jail has been dismissed from this lawsuit; is that correct?
>
> A.  That's my understanding so far, that's right.
>
> Q.  Okay.
>
> A.  But I've still got a contention with it, obviously.

(Dkt. 3-4, pp. 152-53.)

> Q.  So what role did the parole officers and state defendants, and I guess you are focused on Vorhes and Mason; is that correct or is it just Vorhes?

A.     Yes, this is Vorhes, and actually Brood, when he came to the Ada County Jail as well. And what relationship did that have with medication?

Q.     What role did they play in the deprivation of medication as it relates to the Ada County Jail?

A.     Why put me in jail? Why violate me, and throw me in jail? You have the options, the defendants have the options of ankle bracelets, so I could continue my treatment.

Q.     So the root cause of the medical care as it relates to Ada County Jail, as it relates to the remaining individual defendants, Vorhes and Brood, boils down to the same complaints about the exaggerated unnecessary parole violations; is that correct?

A.     Right. Why violate me if l can be taken care of on the street? Why violate me if l can get the decent medical treatment on the street? Why?

Q.     So when you claim in paragraph 57 that you had informed the parole officers that you take 35 to 40 medications, and they ignored that.

A.     Right. They did. Basically --

Q.     Does that relate to the underlying decision to violate you on parole, and put you in Ada County Jail, or did you think there was an independent obligation for them to provide you with that medication?

A.     No, that -- no, not -- they didn't have an independent -- they didn't owe me that. But the Ada County Jail did not adhere to my Eighth Amendment right to be free from cruel and unusual punishment by depriving me of medication I was taking. They didn't have to put me there. They could have just put me on a monitor, and I could have kept up with my medication. I'm not a flight risk. I never ran from anything -- well, except my mother-in-law in my life, but, okay. And so --

Q. Are you alleging as part of your complaint, that Vorhes and Brood knew that Ada County Jail would not provide you with medication?

A. I am.

Q. How did they know that?

A. I'm alleging they had contact with them, either right at the time I went in, because they took me up there. Okay? And they talked to medical when I went into the Ada County Jail.

(*Id.*, pp. 154-55.)

Q. Okay. So your understanding is, or your allegations are that Vorhes and Brood went to Ada County, and specifically told them to deprive you of necessary medical care, because you're a litigator?

A. In some form, yes.

Q. Is that correct?

A. Yes, I've seen it.

Q. And that's based on a conversation you had with a nurse in Ada County?

A. Yes, and I remember a corporal there talking to me about it. And his comments were, who in the hell did you piss off, man. Probation and parole wants you buried, or something like that. And I'm going, really? Surprise. Surprise.

Q. And what was the nurse's name?

A. I want to say, Castleton, but that's not right. It's Castilean or Castileon. I have it written down in my notes. That's one of the things I'm putting together.

Q. And what's the corporal's name?

A. A nice guy. He knows my kids. I'm going to leave him out of it.

> Q. Would you be willing to withdraw the allegations as it relates to the statements the corporal made to you?
>
> A. Yeah.

(*Id.*, pp. 156-57.)

To the extent that Plaintiff has withdrawn the claim that Defendants purposely put Plaintiff in jail to deprive him of adequate medical care, it is dismissed without prejudice. To the extent that Plaintiff is alleging that Defendants should not have had Plaintiff arrested, knowing that he was on numerous medications, there is no case law to support such a claim. Defendants are entitled to qualified immunity, as the Court will explain.

### A. Defendants' Alleged Thwarting of Plaintiff's Ability to Remain on his Medications Prescribed by Outside Providers by Choosing to File a Parole Violation Charge against Him

Plaintiff alleges that the parole officers "failed to acquire verification from the Defendant Ada County officials that they could ensure that Plaintiff Drennon received all of his medications and treatment for numerous physical illnesses before they placed him in the Ada County Jail." (Dkt. 1, p. 16.) He further asserts that the parole officers could have chosen a different path than charging him with a parole violation and putting him in the Ada County Jail, knowing that the Ada County Jail may not be able to prescribe the same medications as his outside providers prescribed for his conditions.

Defendants are entitled to qualified immunity on this claim. There is no precedent that would have put the individual parole officers on notice that they must base decisions of whether to charge a parolee with a parole violation on whether the parolee will be able to obtain at the jail the exact medications prescribed by a private physician.

The Court agrees with the qualified immunity analysis in *White v. Cunningham*, 261 F. App'x 11 (9th Cir. 2007) (unpublished), though not a case of precedence. In that case, the Court determined that the parole officer was entitled to qualified immunity where a widow's parolee husband was arrested and died in jail, because

> [e]xamining the law in light of the specific context of this case, it is not clearly established that parole officials have an Eighth Amendment obligation to either (1) refrain from arresting a parolee who has serious, but non-emergency, medical needs or (2) ensure that relevant authorities at the jail obtain a parolee's medical information that the parole official happens to possess.

*Id.* at 13. Here, Plaintiff's wife actually brought Plaintiff's medications to the jail on the day of his intake, because Vorhes called and told her about Plaintiff's incarceration; thus, Vorhes did more to safeguard Plaintiff's health than the officer did in *White v. Cunningham*.

The record reflects that Vorhes made efforts to advise the jail that Plaintiff was on prescription medications, and those medications could be brought to the jail by Plaintiff's wife. Once Defendants gave jail officials notice and placed Plaintiff into the jail custody, they no longer had a duty to provide for his health care.

Plaintiff has pointed no case law that provides otherwise. Accordingly, Defendants are entitled to qualified immunity for placing Plaintiff in the jail's custody for a parole violation charge and for any omissions that occurred after they placed Plaintiff in jail officials' custody, regardless of the number and types of medications Plaintiff was taking at that time. Plaintiff was informed that he could bring the claims against the jail in a

separate lawsuit, but he chose not to do so. This claim against the State Defendants will be dismissed with prejudice.

**B. Defendants Allegedly Told Jail Officials to Treat Plaintiff Badly out of Retaliation for his First Amendment Prison Litigation Activity**

Plaintiff alleges that Defendants Brood and Vorhes placed him in the Ada County Jail and told jail officials to treat him badly, in retaliation for Plaintiff's prison litigation activity. (Dkt. 1, p. 16.) Plaintiff has not provided the name of the nurse or the officer he was counting on as witnesses to support these allegations. He elected to withdraw this claim during his deposition, as described above. Therefore, this claim is subject to dismissal without prejudice.

## 6. Defendant Randy Blades

After Plaintiff was placed in the Ada County Jail awaiting the outcome of his parole violation, he was transferred into custody of the Idaho Department of Correction (IDOC), where he was housed at the ISCI facility and, and then transferred to the ISCC facility, under the care of Defendant Warden Randy Blades. Plaintiff alleges that the reason for the transfer to an IDOC facility was that Ada County Jail staff could not give him "the absolutely mandatory medication he needed." (Dkt. 1, p. 17.) But, Plaintiff alleges, even after he was transferred into state custody, he was denied "the absolutely mandatory medication." *Id*.

In the Amended Scheduling Order, the Court ordered that "the claim that Plaintiff was not provided with proper medical care at ISCI and ISCC during the time period he was detained for the parole violations" was to be severed from this case and brought in a

separate complaint and separate action. He did not do so. Therefore, the claims against Randy Blades will be dismissed without prejudice.

### 7. Corizon Medical Services and Other Medical Defendants

Plaintiff alleges that, when he was released on March 8, 2016, his medical conditions had become worse. (Dkt. 1, p. 18.) He alleges that state officials and Corizon, the contract medical provider for the IDOC, were deliberately indifferent to his medical needs, including care of his diabetes. These claims also fall into the aforementioned category of "claim[s] that Plaintiff was not provided with proper medical care at ISCI and ISCC during the time period he was detained for the parole violations." Plaintiff was ordered to bring any such claims in a separate complaint and separate action. He did not. Therefore, claims against Corizon and the ISCI medical staff and administration will be dismissed without prejudice.

### 8. Ada County Jail Medical Claims

As noted above, Plaintiff's wife, Elizabeth Drennon, brought Plaintiff's medication to the Ada County Jail medical staff for distribution, and could have continued to bring Plaintiff's medication as needed. (*Id.*, p. 16.) However, Ada County Jail staff allegedly ignored Plaintiff's requests and did not provide him with the medication he needed. All claims against Ada County Defendants have been severed from this action. Therefore, these claims are dismissed without prejudice.

### 9. State Defendants re: Medical Care at IDOC Facilities

Plaintiff alleges IDOC officials failed to provide adequate health care once he was re-incarcerated after his parole violation in late 2015 and early 2016. The Court ordered

that Plaintiff bring all medical and optical care claims for treatment that occurred since Plaintiff's new convictions in a separate complaint. He did not. Therefore, these claims will be dismissed without prejudice.

## 10. Claims against Other Parole Officers

### A. *Defendant Julie Bryant*

Defendant Julie Bryant is a parole officer, but she was not assigned to any specific cases. Bryant asserts that Plaintiff has stated no viable claims or specific factual allegations against her that would show she personally participated in violating Plaintiff's constitutional rights. Plaintiff could not recall in deposition why he was suing Julie Bryant. He believes it was because she signed off on some documents that, in his opinion, were false or misrepresented in about 2015-16. (Depo, pp. 39-40.) Because Plaintiff has not stated sufficient facts to support a federal civil rights claim against Bryant, this claim will be dismissed with prejudice.

### B. *Defendant Angel Dobrev*

Angel Dobrev was Parole Officer Vorhes' supervisor. Plaintiff never met Dobrev. (Depo., p. 43.) Plaintiff included Dobrev in his Amended Complaint only because Dobrev's name appears under a signature on a document signed in 2015 or 2016 that is attached to the original complaint. At deposition, Plaintiff said that he does not know what Dobrev did or what his role was. (Depo., p. 43.) Plaintiff has provided nothing showing that Dobrev personally participated in any alleged constitutional violation. As a result, claims against Dobrev will be dismissed with prejudice.

## C.    Defendant Montelito Mason

Montelito Mason was Plaintiff's parole officer, but Officer Mason was on medical leave for all of 2015. Plaintiff clarified that Mason's acts against him occurred between 2013 and 2015. (Depo., p. 75-76.)

Plaintiff asserts that Mason engaged in "interfering with and stopping plaintiff Drennon from engaging in voluntary assistance to individuals needing to read and understand the law, as well as stalking and harassing Plaintiff Drennon beginning in of October 2013, and continuing to present day." (Drennon's supporting facts, p. 14, para. 47; Depo., p. 57.) Plaintiff has provided no specific facts to support an allegation that Mason crossed the line from closely supervising Plaintiff and his activities in Mason's parole official duties, as Plaintiff agreed to in his parole agreement, to stalking and harassing. This claim will be dismissed on qualified immunity grounds and, alternatively, for failure to state a claim upon which relief can be granted.

Plaintiff also alleges that Mason suggested or told him that he and his wife should get divorced. (Depo., p. 74.) Regardless of whether such advice or direction was made, Plaintiff did not get divorced. This allegation does not rise to the level of a civil rights violation. It will be dismissed on qualified immunity grounds and for failure to state a claim upon which relief can be granted.

Plaintiff alleges that Mason accompanied a sheriff who was serving an eviction notice on Plaintiff. As background for this claim, Plaintiff explains that, even though he was living in the house, another person owned it, and it was in foreclosure. Plaintiff alleges that he filed an action to stop the eviction. Plaintiff faults Mason for issuing him a

parole violation, because the terms of his parole agreement required him to have a place to live. Plaintiff said that Mason was "happy" and even "gleeful" at being able to issue Plaintiff a parole violation. Plaintiff asserts that this was an example of how Mason took it personally to come after him. Plaintiff explained that he considered Mason's actions harassment because, even though Plaintiff is required to maintain a residence while on parole, he believes it has to be an intentional violation, and the foreclosure was the owner's fault, not Plaintiff's. (*Id*., pp. 75-76.)

To the extent that Plaintiff is complaining that Mason served him with a parole violation for not having a place to live, such a claim is covered by absolute immunity, because it is a discretionary decision about the imposition of parole conditions. *See Thornton*, 757 F.3d at 840.

To the extent that Plaintiff is asserting a stalking or harassment claim, Plaintiff cannot maintain such claims without supporting facts. A parole officer is charged with closely supervising the activities of the parolees to whom he or she is assigned. Plaintiff cites to service of the eviction notice and issuance of a parole violation, but no dates, times, or other details of additional acts of stalking or harassment. Plaintiff does not provide any evidence that he was entitled to stay at the residence—for example, that the court had issued an injunction against the foreclosure in the lawsuit he filed. In the face of no facts that would show Plaintiff's entitlement to continue living at the residence, Mason's act of helping serve an eviction notice and issuing Plaintiff a parole violation charge in this situation cannot be considered "stalking" or "harassment," even if Mason spoke to Plaintiff in an unprofessional manner.

The Court has found no case law that would have provide notice to Mason that he could not serve Plaintiff with a notice of eviction and a parole violation for not maintaining a place to live under the legitimate foreclosure and eviction circumstances, or that such actions of a parole officer could constitute stalking and harassment; therefore, Mason is entitled to qualified immunity.

Alternatively, Plaintiff has failed to come forward with sufficient facts to state a claim for relief against Mason. This claim will be dismissed with prejudice on absolute immunity grounds, qualified immunity grounds, and for failure to state a claim upon which relief can be granted.

## 11. State Law Claims

Defendants contend that Plaintiff's state law claims should be dismissed for failure to post bond. The Court disagrees. The provisions of Idaho Code § 6-610 which otherwise require such a bond are inapplicable to civil rights causes of action brought by paupers in federal court. In *Pugsley v. Cole*, 2005 WL 1513112 (D. Idaho June 27, 2005), the court held that an indigent prisoner's state-law claims will not be barred for failure to post the requisite bond. *Id.* at *7. That holding later was adopted by the Idaho Court of Appeals. *See Hyde v. Fisher*, 152 P.3d 653, 656 (Idaho Ct. App. 2007) (adopting *Pugsley*); *see also Beehler v. Fremont County*, 182 P.3d 713, 717 (Idaho Ct. App. 2008).

The Court having dismissed all of the federal claims, the question remains whether the Court should entertain any of the state law claims. Title 28 U.S.C. § 1367(c) "confirms the discretionary nature of supplemental jurisdiction by enumerating the circumstances in which district courts can refuse its exercise", namely where: "(1) the

claim raises a novel or complex issue of State law, "(2) the claim substantially predominates over the claim or claims over which the district court has original jurisdiction, (3) the district court has dismissed all claims over which it has original jurisdiction, or (4) in exceptional circumstances, there are other compelling reasons for declining jurisdiction." 28 U.S.C. § 1367(c). Other factors to be considered are "the circumstances of the particular case, the nature of the state law claims, the character of the governing state law, and the relationship between the state and federal claims," which are principles of "judicial economy, convenience, fairness, and comity." *Carnegie-Mellon University v. Cohill*, 484 U.S. 343, 350 (1988).

The Court will exercise discretion to rule on Plaintiff's state law claims to the extent that they shall be dismissed for the following reasons. In the introductory section of the Amended Complaint, Plaintiff alleges that "Defendants are violating Idaho statute, Idaho Administrative Procedures Act, [and] Idaho statutory law." (Dkt. 1, p. 13.) Many of these claims correlate with federal claims that Plaintiff was ordered to pursue in new, separate complaints, if at all, or with claims of Robert Coy, which have been severed from this action and dismissed in a separate action. Several of Plaintiff's enumerated claims specify that he is making a claim under both the federal and state constitutions. Nowhere in the Complaint does Plaintiff allege state tort claims.

To the extent that Plaintiff has alleged claims under the Idaho Constitution, those claims are dismissed with prejudice for the reasons set forth above, given that Plaintiff has failed to allege that the Idaho Constitution offers any greater protection than the United States Constitution on any of his claims, *see State v. Sharpe*, 129 Idaho 693, 931

P.2d 1211 (Idaho 1997), and thus, resolution of the federal constitutional claims above necessarily resolves the corresponding state constitutional claims. These state law claims will be dismissed with prejudice, as Plaintiff has had several years to amend his causes of action to state viable claims, and yet has not done so.

For reasons of judicial economy, to the extent that Plaintiff's state law claims correlate with causes of action that he has been ordered to pursue in new, separate complaints, rather than in this action, those claims are dismissed without prejudice and may be brought in those actions.

Accordingly, because all of Plaintiff's claims have been disposed of, this entire action will be dismissed.

## ORDER

**IT IS ORDERED:**

1. Defendants' Motion for Summary Judgment (Dkt. 13) is GRANTED.

2. Plaintiff's claims against all Defendants are DISMISSED, as specified above, either with or without prejudice. This entire case shall be closed.

3. Nothing further shall be filed in this closed case other than a notice of appeal, if Plaintiff chooses to appeal the Court's decision.

DATED:  December 26, 2019

_____
Honorable Ronald E. Bush
Chief U. S. Magistrate Judge